IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BILLY WESSON

*Petitioner*

v.

UNITED STATES OF AMERICA,

*Respondent*.

Criminal No. ELH-21-0398
Related Civil No.:  ELH-24-0411

**MEMORANDUM OPINION**

This opinion addresses the post-conviction petition filed under 28 U.S.C. § 2255 by defendant Billy Wesson.  ECF 88 (the "Petition").  In addition, on related grounds, Wesson has filed a "Writ of Mandamus."  ECF 86 ("Motion" or "Writ").[1]  In the Motion, he seeks a "re-sentencing" based on a recent amendment to the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").

The government opposes the Petition (ECF 90).  Wesson has not replied and the time to do so has expired.  The government has not responded to the Writ.

No hearing is necessary to resolve the motions.  For the reasons that follow, I shall deny the Petition and the Motion.

**I.      Factual Background**

On September 30, 2021, a grand jury in the District of Maryland returned an Indictment charging defendant with multiple offenses.  In particular, Counts One through Six charged

---

[1] ECF 86 is, in effect, a motion for reduction of sentence under Amendment 821.  Wesson refers to Amendment 821 to the Guidelines as "House Resolution 821."  *Id.* at 1.  The Office of the Federal Public Defender ("FPD") has declined to supplement defendant's motion for reduced sentence.  ECF 91.

defendant with three counts of Hobbs Act Robbery, pursuant to 18 U.S.C. § 1951(a), and three counts of Brandishing a Firearm During a Crime of Violence, pursuant to 18 U.S.C. § 924(c)(1)(A)(ii).  These counts concerned the armed robberies of three Royal Farms stores in Baltimore on August 4, 2020, August 6, 2020, and August 7, 2020.  In addition, Counts Seven and Eight charged defendant with the offenses of Possession With Intent to Distribute Controlled Substances, pursuant to 21 U.S.C. § 841(a), and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, under 18 U.S.C. § 924(c)(1)(A)(i).  These offenses occurred on August 8, 2020.

On July 26, 2022, defendant entered a plea of guilty to Counts Seven and Eight of the Indictment.  ECF 47 (Blake, J. presiding); *see also* ECF 76 (Rule 11 Transcript); ECF 90-1 (same).  The plea was tendered pursuant to a Plea Agreement.  ECF 48.  Notably, Count Eight required a mandatory minimum sentence of five years, consecutive to any other sentence.  *See id.* ¶ 3; 18 U.S.C. § 924(c)(1)(A); U.S.S.G. § 2K2.4(b).  Pursuant to Fed. R. Crim. P. 11(c)(1)(C) ("C Plea"), the parties agreed to a total sentence ranging between 84 months and 132 months of imprisonment.  ECF 48, ¶ 8.

Of relevance, the Plea Agreement contained a lengthy Statement of Facts.  *Id.* at 10-11.  It established the defendant's commission of the three armed robberies of convenience stores in August 2020.  *Id.*  And, in the Plea Agreement, defendant agreed to the commission of these offenses, and to their consideration as "Relevant Conduct" in regard to the calculation of the Guidelines applicable to him.  *Id.*; *see also id.* ¶¶ 6(b)-6(f).  In addition, defendant agreed that, during his drug trafficking activity, he possessed the same firearm that he had brandished during the three armed robberies.  *Id.* at 11.

As to the armed robberies, the Plea Agreement provided for a five-level enhancement for brandishing a firearm during the robberies, under U.S.S.G. § 2B3.1(b)(2)(C).  ECF 48, ¶¶ 6(c),

(d), (e).  For Count Seven and the relevant conduct, the Plea Agreement contemplated a final offense level of 26, after two deductions for acceptance of responsibility under U.S.S.G. § 3E1.1(a).  *See* ECF 48, ¶ 6(h).[2]  The Guidelines for Count Eight corresponded to the mandatory minimum sentence of imprisonment, *i.e.*, five years, consecutive.  *Id*. ¶ 6(i); *see* U.S.S.G. § 2K2.4(b).

Because of defendant's contentions in the Petition, it is important to review the Statement of Facts in the Plea Agreement.  ECF 48 at 10-11.  Notably, Wesson stipulated to these facts.

On August 4, 2020, at approximately 9:06 p.m., Wesson and a co-conspirator robbed the Royal Farms store located at 3701 Fleet Street in Baltimore.  *Id.* at 10.  When the robbers entered the store, Wesson, who was wearing New Balance sneakers, pointed a blue and silver firearm (a Ruger EC9S firearm, S/N: 45476784) at the store cashier.  Upon seeing the robbers, the cashier began to run to the rear of the store.  *Id.*  Wesson yelled at the employee, stating "give me [the] fucking money and open the register," and he also chased the cashier.  *Id.*  After Wesson caught the cashier, defendant walked her to the cash register area, where she opened the register at gunpoint.  Wesson took $176 from the register drawer and the robbers then fled.  *Id.*

Two days later, at approximately 11:50 p.m. on August 6, 2020, Wesson and a co-conspirator robbed the Royal Farms store located at 206 West Coldspring Lane in Baltimore.  *Id.*  Wesson, who was carrying the same blue and silver firearm used on August 4, 2020, entered the store, approached a store employee from behind, and placed the firearm to the back of the cashier's head. He stated to her, "go to [the] register and open it." Wesson then walked the cashier to the

---

[2] The government expressly declined to move for a one-point deduction under U.S.S.G. § 3E1.1(b).  *See* ECF 48, ¶ 6(g).

register area, ordered her to open the register, and took $165 from the drawer.  Defendant and his co-conspirator then fled in a vehicle driven by another co-conspirator.

On August 7, 2020, at 12:36 a.m.—less than an hour after the robbery of the Royal Farms Store on West Coldspring Lane—Wesson and a co-conspirator robbed the Royal Farms store located at 3635 Keswick Road in Baltimore.  Wesson and his co-conspirator entered the store, where Wesson pointed the Ruger firearm at a store employee.  He ordered the employee to open the store's cash register. The employee complied with the request but was only able to open the first cash drawer in the register and not the second. Wesson took $80 from the cash drawer and then threw the empty cash drawer at the employee. The robbers then fled.  *Id.*

On the evening of August 8, 2020, at approximately 10:53 p.m., four Baltimore City police officers were conducting routine patrol in an unmarked vehicle in the 5100 block of Midwood Avenue in Northwest Baltimore.  *Id.* at 11.  The officers saw Wesson wearing a satchel across his body, and they observed him conduct what they regarded as a "security check" for a weapon.  *Id.* Because the officers suspected that Wesson was armed, they stopped their car.  *Id.*  When Wesson saw the officers exiting their car, he immediately fled.  *Id.*  As the officers pursued Wesson, he threw his satchel on the sidewalk.  *Id.*

Law enforcement officers recovered the abandoned satchel and searched it.  The satchel contained the loaded Ruger EC9S firearm used in the commission of the robberies described above.  Wesson was apprehended. At the time of his arrest, he was wearing the same New Balance sneakers he had worn during the robbery on August 4, 2020.  *Id.*  The sum of $279 in U.S. currency was recovered from his person.  *Id.*

The satchel contained a medicine bottle containing 7 blue baggies of a white rock substance, confirmed by lab results to be cocaine, and a black drawstring bag containing the

following: (1) a plastic bag containing a white rock substance, confirmed to be cocaine; (2) 55 gel capsules of white powder (later confirmed not to be drugs); (3) 3 green Ziploc baggies of white rock substance, confirmed to be cocaine; and (4) 3 pink jugs of white rock substance, confirmed to be cocaine. *Id.*  The cocaine, which amounted to less than 50 grams in total, was packaged for street-level distribution.  *Id.*

At the guilty plea proceeding on July 26, 2022, defendant was placed under oath.  ECF 76 (Guilty Plea Transcript), at 2; ECF 90-1 (same), at 2.  Among other things, he acknowledged the following:

• He was "completely satisfied" with the representation of his lawyer. *Id.* at 11.

• He was not forced to enter into the Plea Agreement. *Id.*; *id.* at 19.

• He was not under the influence of a substance that would affect his thinking. *Id.* at 4.

• He understood the charges to which he was pleading and the punishments associated with the charges. *Id.* at 5-7.

• He understood the rights he had and the rights he waived by pleading guilty.  *Id.* at 8-10.

• He understood he was waiving any defenses to the charges.  *Id.* at 10.

• He understood the applicability of the sentencing guidelines. *Id.* at 7.

• He understood Judge Blake's summary of the Plea Agreement, which included a discussion of the Guidelines stipulation and the sentencing range, pursuant to Fed. R. Crim. P. 11(c)(1)(C). *Id.* at 15-16, 19.

• He agreed that the Statement of Facts summarized by the Court (*id.* at 12-15), which included a description of the armed robberies (*id.* at 12-14), was accurate and he agreed that he is guilty of all of the offenses. *Id.* at 15.

• He had no questions about pleading guilty or the terms of the Plea Agreement. *Id.* at 19.

Judge Blake accepted defendant's guilty plea to Counts Seven and Eight. *Id.* at 20. She concluded that defendant was competent to plead guilty and had made his decision knowingly, intelligently, and voluntarily. *Id.*

The Presentence Report ("PSR", ECF 72)[3] reflected an initial offense level of 12 for Count Seven. *Id.* ¶ 29. But, based on the relevant conduct that was included in the Guidelines calculation, the defendant's final offense level was 27, after two deductions under U.S.S.G. § 3E1.1(a). *Id.* ¶ 54; *see id.* ¶¶ 24-54. But, as mentioned, for Count Seven the Plea Agreement had contemplated a final offense level of 26. *See* ECF 48, ¶ 6(h). And, as noted, the Guidelines for Count Eight corresponded to the congressionally mandated minimum sentence. ECF 72, ¶ 55.

The one-point discrepancy between the Plea Agreement and the PSR concerned the use of the firearm during the robberies. In particular, the Probation Officer determined that pointing a firearm at the cashiers and the pointing of a firearm at the back of the cashier's head required a six-level increase under U.S.S.G. § 2B3.1(b)(2)(B). *See* ECF 72, ¶¶ 31, 37, 43. In contrast, the Plea Agreement had contemplated a five-level increase. ECF 48, ¶ 6. But, defense counsel had no objections to the calculation in the PSR. ECF 76 at 4. Indeed, the Probation Agent's calculation appears accurate.

The PSR also reflected that defendant had three criminal history points for three offenses committed when he was a juvenile. *Id.* ¶¶ 57-59. This included robbery with a deadly weapon at age thirteen. *Id.* ¶ 58. And, at the time of the instant federal offenses, defendant was on supervision. Therefore, two points were added under U.S.S.G. § 4A1.1(d). *Id.* ¶ 62. With a total of five criminal history points, defendant had a criminal history category of III. *Id.* ¶ 63.

---

[3] An earlier version of the PSR appears at ECF 51.

The Guidelines were amended, effective November 1, 2023.  As a result, if defendant were sentenced today, he would not have received the additional two status points.  *See* U.S.S.G. § 4A1.1(e).  Therefore, if sentenced today, defendant would have a criminal history category of II.

Based on an offense level of 27 and a criminal history category of III, defendant's Guidelines for Count Seven called for a sentence ranging from 87 months to 108 months of imprisonment.  ECF 72, ¶ 98.  Combined with the minimum sentence of 60 months, consecutive, for Count Eight, the total Guidelines ranged from 147 months to 168 months.

However, if defendant had a criminal history category of II, his Guidelines for Count Seven would have been 78 to 97 months.  And, combined with Count Eight's mandatory minimum sentence of 60 months, consecutive, the total Guidelines range would have been 138 months to 157 months of imprisonment.

Sentencing was held on November 7, 2022.  ECF 71.  At the time, defendant was 20 years old.  ECF 72 at 3.  And, as noted, under the C Plea, the parties agreed to a sentence ranging between 84 and 132 months of imprisonment.

The Court (Hollander, J.) was advised that neither side had any objections to the PSR.  ECF 78 (Sentencing Transcript) at 4; ECF 90-2 (same), at 4.  Therefore, the Court adopted the calculations of the Guidelines as set forth in the PSR.  *Id.*

Nevertheless, at sentencing the Court carefully explained to the defendant the process of the calculation of the Guidelines, including as to the matter of relevant conduct.  I said, in part: ECF 78 at 6-13, ECF 90-2 at 6-13 (emphasis added):

> So I want to underscore that the guidelines must be calculated and they must be calculated correctly, but once calculated they are merely advisory.
>
> Having said that, Mr. Wesson, there are quite a number of cases that describe the guidelines as the starting point or the initial benchmark in what is always the Court's overarching objective in every case and that is to arrive at a

sentence sufficient but not greater than necessary. And I'll just add that in my view, that test is so easy to articulate and oftentimes so very difficult to apply.

So I hope that background is helpful. Now I'm going to undertake the calculations. *And in this case I will just also make note of the fact that there is relevant conduct that factors into the calculations, and I'll explain as we go.*

*So the plea agreement contains a stipulation that specifically establishes the defendant's commission of additional offenses. And they are treated as if the defendant has been convicted of them. This is under [U.S.S.G.] § 1B1.2(c).*

\*   \*   \*

And in this case the defendant was charged in multiple counts. *He didn't plead guilty to all those counts. He only pled to two of them but he stipulated* to three robberies. And these robberies do not group. That's a term of art. [§] 3D1.2 excludes them from grouping. I say it's a term of art because it does require some familiality with the guidelines, but what we mean by that is they sort of are treated individually as separate crimes when I do the calculations.

\*   \*   \*

Count 7 is its own group. I'll call that Group 1. That's the offense of possession with intent to distribute controlled substances, and for that offense, you'll recall, the offense itself is found in 21 U.S.C. -- that's United States Code -- § 841(a)(1). The guideline that corresponds is [§] 2D1.1, and under the guidelines you start out with the base offense level of 12 because you possessed less than 50 grams of cocaine. And in particular, this is under [§] 2D1.1(a)(5). So for that group, you have an offense level of 12.

*Now, let's talk about the relevant conduct I mentioned. These are other offenses to which you admitted in your plea. You're not sentenced for them individually, Mr. Wesson, but they are part of the analysis in figuring out your guidelines, and they don't group.* So Group 2 is the robbery of August 4 of 2020. That's the Royal Farms store on Fleet Street. And the guideline here, the offense itself is found in 18 U.S.C. § 1951. The corresponding guideline would be [§] 2B3.1. For this offense, you start out with an offense level of 20. And according to the plea agreement, specifically Paragraph 6(d), the parties agreed to a five-level enhancement because a firearm was brandished, and this would be under 2B3.1(b)(2)(C).

Now, a Probation Office[r] contends that the defendant's conduct of pointing a firearm at two store cashiers and placing a firearm to the back of the head of another cashier falls under conduct described as if a firearm was otherwise used under [§] 2B3.1(b)(2)(B). Otherwise used as defined in § 1B1.1 Application Note J as "The conduct did not amount to the discharge of a firearm but was more than

brandishing[,] displaying, or possessing a firearm," and under [§] 2B3.1(b)(2)(B) a firearm was otherwise used and that means it would be a six-level increase, not the five levels the parties are contemplating. So far, you add those up, remember you started out with a base offense level of 20, if it's six levels as the PSR says, it's now an adjusted offense level of 26. The parties have anticipated a 25.

Group 3 is another robbery. That one was August 6th of 2020, the Royal Farms store on West Cold Spring Lane at about 11:50 p.m., and under the guidelines, again, you have a base offense level of 20 under [§] 2B3.1(a), and the parties have agreed to a five-level enhancement because a firearm was brandished under 2B3.1(b)(2)(C). For the very same reasons that the presentence report explained with respect to the armed robbery on August 4 of the Royal Farms store on Fleet Street, the same analysis would apply here. The presentence report actually awards a six-level increase, not a five-level increase.

Group 4 is a robbery on August 7 of 2020, the Royal Farms store on Keswick Road. It was at 12:36 a.m. So it looks like a different date but it's actually a very short time after the robbery on the Royal Farms store on Cold Spring Lane. And for this calculation, it's exactly the same as the ones I did two other times already. And so it would be an adjusted offense level of 26.

Now, Mr. Wesson, the guidelines have a system, if you will, or a process of trying to account for all these groups. And for this I looked to [§] 3D1.4(a), (b), and (c). And one unit is assigned to the group with the highest offense level. An additional unit is assigned for each group that is equally serious or from one to four levels less serious, and a half unit is assigned to any group that is five to eight levels less serious.

In this case, the highest offense level was either Group 2, Group 3, or Group 4, a 26. The presentence report awards a total of three units, and that means you take the 26 and you add based on what's at [§] 3D1.4, a total of three levels to account for all of the conduct. You combine them, essentially, under [§] 3D1.4 and you get -- before any deductions, you get an adjusted offense level of 29 where the parties had expected it to be a 28.

The defendant does earn two deductions under 3E1.1(a) for his acceptance of responsibility for his criminal conduct and in the plea agreement, if I'm remembering correctly, the Government declined to make a motion under [§] 3E1.1(b) for one more deduction; is that right?

[THE PROSECUTOR]: That's correct, Your Honor. The parties did go to a motions hearing in this case.

THE COURT: And I actually read that to educate myself about the case, so I saw that. And that means the final offense level is a 27. The parties had anticipated a 26. So there's a one-point difference.

Now, that's not the end of it, Mr. Wesson. Sentencing in federal court is really, frankly, pretty complicated. There's another count out there, that's Count 8, possession of a firearm in furtherance of a drug trafficking crime, and that offense is found in 18 U.S.C. § 924(c) and the corresponding guideline is[§] 2K2.4. For this offense, the guideline corresponds to a congressionally mandated minimum sentence of five years under [§] 2K2.4(b). So that's on top of what I've already reviewed with you.

Now, in order to calculate guidelines, offense level is part of the equation, a defendant's criminal history is also part of the calculus, and that looks only to offenses that score points. And the defendant's presentence report reflects that he has one point for an offense committed at age 13 in Paragraph 57, another point for an offense referenced in Paragraph 58 when he was 13, and then an offense referenced in Paragraph 59 when he was 15. So that's a total of three points.

However, the defendant committed the offenses that bring him here today while under a criminal justice sentence. It was the one for CDS possession referenced in Paragraph 59 in the Circuit -- in the Juvenile Court for Baltimore City, case 17108066. So two points are added under [§] 4A1.1(d). That means that there's a total of five points and five points yields a criminal history category of III.

*Now, I mentioned a bunch of offenses, Mr. Wesson, but you can only be sentenced for the offenses to which you actually pled guilty. We are talking about guidelines now but the offenses for which you've pled guilty are Counts 7 and 8. Count 7 carries as maximum term of imprisonment of 20 years; Count 8 has a congressionally mandated minimum term of imprisonment of five years with a maximum of life, and it must be imposed consecutive to any other sentence.*

Now, looking at the guidelines, for Count 7, there's a final offense level of 27 and a criminal history category of III. The guidelines would yield a period of -- a sentence calling for a period of incarceration ranging from 87 months to 108 months. If it had been 26 with the offense level as had originally been anticipated with a criminal history category of III, the guidelines would call for a period of incarceration of 78 to 97 months; and for Count 8, the guidelines sentence is the minimum term of imprisonment required by statute, as I mentioned, five years consecutive.

Now, if you add them all up, if you will, that's one way to look at it because there's the 60 months for the Count 8 and then there's the offense level for Count 7 and the criminal history category. So if it had been a 26 offense level with a criminal history category of III, the total guidelines would be 138 to 157 months. In fact, it's a 27 and a III. So the total guidelines are 147 to 168 months of incarceration and the C Plea is 84 months to 132 months. And so regardless of whether it's an offense level of 26 or an offense level of 27 for Count 7, the total, if you will, either way, the C Plea is well below the advisory sentencing guideline range. Obviously, it's

more significant if it's really an offense level of 27 but either way, at [the] C Plea range of 84 to 132 months, it's below the guideline range even using the 26 as the offense level.

The Court sentenced defendant to a total term of 125 months' imprisonment: 65 months as to Count Seven and the mandatory minimum of 60 months, consecutive, as to Count Eight. ECF 73; *see also* ECF 78 at 53; ECF 90-2 at 53. The Court observed that defendant's conduct was "brazen" and "senselessly traumatized innocent victims." ECF 90-2 at 50; *see also id.* at 30. Nevertheless, the Court imposed a sentence that was below the eleven years (132 months) sought by the government under the C Plea. *Id.* at 3, 14, 23.

The Plea Agreement contained a waiver of defendant's appellate rights. ECF 48, ¶ 10. Defendant did not note an appeal.

On or about February 21, 2023, defendant mailed his first Motion to Vacate, Set Aside or Correct Sentence ("First Petition"). ECF 75. He claimed, on various grounds, that he received ineffective assistance of counsel. Specifically, defendant maintained that he received ineffective assistance of counsel because (1) counsel did not advise him properly concerning the Guidelines calculation in the Plea Agreement; and (2) counsel did not "alert the court or argue that the inclusion of counts counts [sic] (1), (3), and (5) as relevant conduct was contrary to" U.S.S.G. § 1B1.3. As a result, defendant insisted that he received a sentence greater than one he otherwise would have received. *Id.* at 4-7.

On May 9, 2023, the government responded to the First Petition. ECF 81. Then, on June 5, 2023, defendant moved to withdraw his First Petition. ECF 82. By Order of June 6, 2023, I granted that motion and dismissed the First Petition, without prejudice. ECF 83.

On January 27, 2024, defendant filed his second § 2255 motion, *i.e.*, the Petition.  He again claims ineffective assistance of counsel and asserts other errors in sentencing. ECF 88.  And, in the "Writ", he seeks a resentencing based on Amendment 821.

## II.   Timeliness

The Petition was filed on January 27, 2024.  ECF 88.  Without explanation, defendant asserts:  "Petitioner's one year tolling is not in effect until May 5th, 2024."  ECF 88 at 11.   In the first instance, the government claims that the Petition was untimely filed and therefore it is subject to dismissal.  ECF 90 at 10.

Under 28 U.S.C. § 2255(f), there is a one-year period of limitations by which a petitioner must file a motion for post conviction relief.  This one-year period begins on the latest of the following dates:  (1) the date on which the petitioner's judgment became final; (2) the date on which any unconstitutional, government-created impediment preventing the petitioner from filing this motion was lifted; (3) the date on which a newly asserted right was recognized by the Supreme Court and made retroactive on collateral review; or (4) the date on which the facts supporting the petitioner's claim for relief "could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(1)-(4).

The judgment was entered on November 7, 2022.  ECF 73.  Defendant's time to note a direct appeal expired fourteen days later, on November 21, 2022.  *See* Fed. R. App. Pro. 4(b)(1)(A)(i).  Wesson did not note an appeal.  Therefore, the one-year period to file for post-conviction relief began on November 21, 2022, when the Judgment became final.  Accordingly, under 28 U.S.C. § 2255(f), defendant's § 2255 Petition was due by Tuesday, November 21, 2023.

Defendant timely filed his First Petition on March 1, 2023.  ECF 75.  But, he subsequently moved to withdraw it.  ECF 82.  Therefore, at defendant's request, the First Petition was dismissed,

without prejudice, on June 6, 2023.  ECF 83.  As noted, the Petition was not filed until January 27, 2024—well after the deadline.  ECF 88.  Therefore, the Petition is untimely on its face.

Equitable tolling is available in "those 'rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.'"  *Whiteside v. United States*, 775 F.3d 180, 184 (4th Cir. 2014) (en banc) (applying equitable tolling to one-year limitation period in 28 U.S.C. § 2255) (quoting *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc)) (additional citations omitted); *see Hill v. Braxton*, 277 F.3d 701, 704 (4th Cir. 2002); *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000).  But, under *Holland v. Florida*, 560 U.S. 631 (2010), "a 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."  *Id.* at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

Notably, a petitioner need show only "reasonable diligence."  There is no requirement for "maximum feasible diligence."  *Holland*, 560 U.S. at 653 (citation omitted).  But, defendant has failed to "explain how he exercised diligence during the original limitations period."  *Smith v. Warden of FCI Bennettsville*, JRR-22-3340, 2023 WL 3251411, at *5 (D. Md. May 4, 2023).

Under § 2255(f)(4), the one-year period of limitations may begin on the date on which the facts supporting the petitioner's claim for relief "could have been discovered through the exercise of due diligence."  Wesson claims that his "[o]ne year tolling is not in effect until May 5th, 2024."  ECF 88 at 11.  But, he does not explain why he believes any tolling is warranted or why he believes his § 2255 Petition could be filed through May 5, 2024.

Defendant was present at his sentencing.  He was aware of what transpired.  On the facts advanced here, defendant offers no grounds to invoke equitable tolling.  *See Allen v. United States*,

WDQ-12-2260, 2013 WL 4495670, at *2 (D. Md. Aug. 16, 2013) (dismissing the § 2255 motion because defendant failed "to establish factors that warrant equitable tolling of the statute of limitations"); *Diaz v. United States*, WMN-12-3414, 2013 WL 709783, at *1 (D. Md. Feb. 26, 2013) ("[Petitioner] did not file the Motion until . . . eight months after the limitations period expired. Unless principles of equitable tolling apply, the Motion must be dismissed as untimely.").

Accordingly, the Petition is subject to dismissal on the ground that it was untimely filed. However, I shall assume, *arguendo*, that defendant's Petition was timely filed. Therefore, I shall address the merits.

In general, defendant's claims fall into two categories:  allegations as to ineffective assistance of counsel, and allegations concerning errors at sentencing.  All of the claims are without merit.

### III.  Legal Standard as to the Petition

I begin with a review of the legal standard that governs the Petition.

Section 2255(a) of Title 28 of the United States Code provides relief to a prisoner in federal custody only on specific grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'" *See Hill v. United States*, 368 U.S. 424, 426-27 (1962) (citing 28 U.S.C. § 2255); *see also United States v. Hodge*, 902 F.3d 420, 426 (4th Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015); *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010).

Relief under § 2255 is meant to remedy fundamental constitutional, jurisdictional, or other errors.  It is reserved for situations in which failure to grant relief "'inherently results in a complete

miscarriage of justice.'"  *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting *Hill* 386 U.S. at 428).

Under § 2255, the petitioner must establish (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceeding invalid. *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003). But, "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Addonizio*, 442 U.S. at 185 (quoting *Hill*, 368 U.S. at 428).  In order to prevail on a § 2255 petition, a defendant bears the burden of proving his grounds for collateral relief by a preponderance of the evidence. *See Jacobs v. United States*, 350 F.2d 571, 574 (4th Cir. 1965).

Of relevance here, a motion under § 2255 must be timely filed.  Pursuant to 28 U.S.C. § 2255(f), a motion under § 2255 must be filed within one year, which runs from the latest of:  (1) the date on which the conviction became final; (2) the date on which the "impediment to making a motion created by governmental action . . . is removed," if the movant was prevented from making his motion by governmental action; (3) the date on which the right asserted was recognized by the Supreme Court, if that newly-recognized right has been made retroactive to cases on collateral review; or (4) the date on which the facts supporting the claims could have become known through the exercise of due diligence.  *See* 28 U.S.C. § 2255(f)(2)-(4).

The scope of collateral attack under § 2255 is narrower than on appeal, and a "'collateral challenge may not do service for an appeal.'" *Foster v. Chatman*, 488, 519 (2016) (Alito, J., concurring) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)). A failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 motion, unless the petitioner can demonstrate "cause and actual prejudice resulting from the errors

of which he complains," or "actual innocence." *Pettiford*, 612 F.3d at 280 (citing *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999)); *see Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Reed v. Farley*, 512 U.S. 339, 354 (1994) (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"); *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (discussing requirements for a claim of actual innocence); *United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009).

Generally, the rule governing procedural default of claims brought under § 2255 precludes consideration of any contentions that "'could have been but were not pursued on direct appeal, [unless] the movant . . . show[s] cause and actual prejudice resulting from the errors of which he complains.'" *Pettiford*, 612 F.3d at 280 (quoting *Mikalajunas*, 186 F.3d at 492-93). Under the "cause and prejudice" standard, the petitioner must show: (1) cause for not raising the claim of error on direct appeal; and (2) actual prejudice from the alleged error. *Bousley*, 523 U.S. at 622; *see Dretke*, 541 U.S. at 393; *Massaro v. United States*, 538 U.S. 500, 505 (2003); *see also Reed*, 512 U.S. at 354 (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"); *Murray*, 477 U.S. at 496; *Frady*, 456 U.S. at 167-68.

In order to show cause for not raising the claim of error on direct appeal, a petitioner must prove that "some objective factor external to the defense such as the novelty of the claim or a denial of effective assistance of counsel" impeded their counsel's efforts to raise the issue earlier. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *see Carrier*, 477 U.S. at 492 ("[C]ause . . .

requires a showing of some external impediment preventing counsel from constructing or raising the claim."); *Mikalajunas*, 186 F.3d at 493 (movant must demonstrate "something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel"). Additionally, the alleged error cannot simply create a possibility of prejudice, but must be proven to work to the petitioner's "*actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Frady*, 456 U.S. at 170 (emphasis in original).  Pursuant to the Supreme Court's ruling in *Carrier*, 477 U.S. at 494, prejudice does not support relief of a procedural default in the absence of a showing of cause.  *See also Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

The actual innocence exception "only applies in limited circumstances."  *United States v. Jones*, 758 F.3d 579, 583 (4th Cir. 2014).  Indeed, it must be "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent . . . ."  *Carrier*, 477 U.S. at 496.

In order to show "actual innocence," the petitioner "must demonstrate actual factual innocence of the offense of conviction, *i.e.*, that petitioner did not commit the crime of which he was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not factually, innocent."  *Mikalajunas*, 186 F.3d at 494 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)); *see also Bousley*, 523 U.S. at 623.  Notably, the petitioner must meet this burden by clear and convincing evidence.  *Mikalajunas*, 186 F.3d at 494.  In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  *Jones*, 758 F.3d at 583; *see Bousley*, 523 U.S. at 623.

As the Fourth Circuit has said, "[a] valid actual innocence claim 'requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be

exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" *Finch*, 914 F.3d at 298 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  Moreover, a petitioner must "'demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice.'" *Finch*, 914 F.3d at 298 (quoting *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012)).  It is an "exacting standard," based on a "'holistic judgment about all the evidence'. . . ." *Finch*, 914 F.3d at 299 (quoting *House v. Bell*, 547 U.S. 518, 539 (2006)).

However, the failure to raise on direct appeal a claim of ineffective assistance of counsel is not regarded as procedurally defaulted. *Massaro*, 538 U.S. at 509; *see United States v. Faulls*, 821 F.3d 502, 507-08 (4th Cir. 2016). Indeed, such claims ordinarily are not litigated on direct appeal.  Claims of ineffective assistance are cognizable on direct appeal "only where the record conclusively establishes ineffective assistance." *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010).   Rather, such claims are usually litigated in a § 2255 action to allow for development of the record. *Massaro*, 538 U.S. at 504-06; *United States v. Ladson*, 793 F. App'x 202 (4th Cir. Feb. 12, 2020) (per curiam).

Moreover, the Court is mindful that a self-represented litigant is generally "held to a 'less stringent standard' than is a lawyer, and the Court must liberally construe his claims, no matter how 'inartfully' pled." *Morrison v. United States*, RDB-12-3607, 2014 WL 979201, at *2 (D. Md. Mar. 12, 2014) (internal citations omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *Quintero v. Garland*,

998 F.3d 612, 634 (4th Cir. 2021) (same); *Bala v. Commonwealth of Virginia Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (per curiam) (same).

Pursuant to 28 U.S.C. § 2255(b), the court must hold an evidentiary hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief . . . ." *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021); *see United States v. LeMaster*, 403 F.3d 216, 220-23 (4th Cir. 2005); *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004). Ordinarily, a district court has discretion as to whether to hold a hearing, but "a hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claim . . . ." *Mayhew*, 995 F.3d at 176-77. If the district court "denies relief without an evidentiary hearing," the appellate court will "construe the facts in the movant's favor." *United States v. Akande*, 956 F.3d 257, 261 (4th Cir. 2020); *see also United States v. Sutherland*, ___ F.4th ___, 2024 WL 2787960, at *4 (4th Cir. May 31, 2024); *United States v. Turner*, 841 F. App'x 557, 559 (4th Cir. 2021).

In my view, no hearing is necessary here, because the motions do not implicate matters of credibility.

## IV.  The Guilty Plea

As noted, on July 26, 2022, Wesson entered a plea of guilty to two charges and admitted to conduct that was charged in six other counts.  At the time, he took an oath to tell the truth.  *See* ECF 90-1 at 2.  In the context of a post-conviction petition, the guilty plea is significant.

A guilty plea represents an admission by a defendant that "he actually committed the crime" in issue and that "he is pleading guilty because he is guilty."  *United States v. Hyde*, 520 U.S. 670, 676 (1997).  A guilty plea also constitutes a "waiver of [a defendant's] right to trial

before a jury or a judge." *Brady v. United States*, 397 U.S. 742, 748 (1970). It is "a grave and solemn act . . . ." *Id.*; *see also Bousley v. United States*, 523 U.S. 614, 618 (1998).

Thus, to be valid, the plea of guilty must reflect an "intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). Moreover, in order for a guilty plea to be valid, it must be voluntary. *Brady*, 397 U.S. at 748. And, "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id.*; *see Bradshall v. Stumpf*, 545 U.S. 175, 183 (2005) (same). Once a guilty plea is entered, however, there is "a strong presumption that the plea is final and binding." *United States v. Lambey*, 974 F.3d 1389, 1394 (4th Cir. 1992).

When, as here, a judgment of conviction based upon a guilty plea is later subjected to a collateral attack, such as by a § 2255 petition, the court's inquiry is "ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569 (1989). A plea cannot be "voluntary in the sense that it constituted an intelligent admission . . . unless respondent received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" *Henderson v. Morgan*, 426 U.S. 637, 645 (1976) (quoting *Smith v. O'Grady*, 312 U.S. 329, 334 (1941)). But, in *Marshall v. Lonberger*, 459 U.S. 422 (1983), the Court recognized that "'it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit.'" *Id.* at 436 (1983) (quoting *Henderson*, 426 U.S. at 647) (internal quotations omitted).

Indeed, a defendant is "bound," absent clear and convincing evidence to the contrary, "by the representations he made under oath during a plea colloquy." *Fields v. Attorney Gen. of Md.,*

956 F.2d 1290, 1299 (4th Cir. 1992); *see Blackledge v. Allison*, 431 U.S. 63, 74-75 (1977); *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005). Thus, "a defendant's solemn declarations in open court affirming a [plea] agreement . . . 'carry a strong presumption of verity.'" *Lemaster*, 403 F.3d at 221 (quoting *Blackledge*, 431 U.S. at 74); *see United States v. DeFusco*, 949 F.2d 114, 119 (4th Cir. 1992) (stating that defendant's statements at the plea hearing are "strong evidence of the voluntariness of his plea.").

Conclusory allegations in a § 2255 petition that are contrary to testimony provided at a Rule 11 hearing are "palpably incredible and patently frivolous or false." *Lemaster*, 403 F.3d at 222. As the Fourth Circuit has explained, "courts must be able to rely on the defendant's statements made under oath during a properly conducted Rule 11 plea colloquy." *Id.*; *see also Blackledge,* 431 U.S. at 74; *White*, 366 F.3d at 295-96; *United States v. Bowman*, 348 F.3d 408, 417 (4th Cir. 2003).

The Fourth Circuit has acknowledged that, on post-conviction, a defendant who has pled guilty "has an incentive to claim, in retrospect, that the result of the plea process would have been different regardless of whether that claim is, in fact, true." *United States v. Murillo*, 927 F.3d 808, 815 (2019); *cf. Lee v. United States*, 582 U.S. 357, 369 (2017) ("Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies."). Therefore, "to prevent criminal defendants with bargainer's remorse, from simply claiming they would not have taken a deal but for a bit of bad advice," the defendant must "provide evidence of [his] sincerity." *Murillo*, 927 F.3d at 816.

In particular, the defendant "must point to evidence that demonstrates a reasonable probability that, with an accurate understanding of the implications of pleading guilty, he would have rejected the deal." *Id.* Here, defendant does not "point to evidence" that undermines his

knowing and voluntary decision to plead guilty based on a complete "understanding of the implications of pleading guilty . . . ." *Id.*

In the context of a plea bargain, "the defendant is the master of the outcome." *Murillo*, 927 F.3d at 815. Therefore, "[t]he prejudice analysis in the context of the plea-bargaining process requires a fact-based evaluation of the weight of the evidence." *Id.* And, the "plea agreement language and sworn statements must be considered in their context[.]" *Id.* at 817; *see Lemaster*, 403 F.3d at 221-22; ECF 45-1 at 38-39.

## V.  The Contentions in the Petition

### A.  Ineffective Assistance of Counsel

In Ground One, defendant complains, *inter alia*, that his attorney erred by failing to object to the Court's adoption of the Presentence Report, which erroneously calculated his Guidelines. ECF 88 at 4. He also contends that the Court committed a "fundamental error" when it misapplied U.S.S.G. § 1B1.2, and yet his defense counsel failed to object. *Id.*

In particular, defendant complains that the robbery offenses were erroneously "treated as if the defendant had been convicted of them," even though he was merely charged with those offenses. *Id.* As a result, defendant claims that he received "a sentence much longer than he should have received." *Id.* According to Wesson, "if counsel would have objected to the mis-application of 1.B1.2, this petitioner would have been sentenced to 63-78 months." *Id.*

### 1.  The Legal Standard for Ineffective Assistance of Counsel

The Sixth Amendment to the Constitution guarantees a criminal defendant the right to the effective assistance of competent counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, 580 U.S. 100, 118 (2017); *United States v. Ductan*, 800 F.3d 642, 648 (4th Cir. 2015). Ineffective assistance of counsel is a well recognized basis for collateral relief. *See*

generally *Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged framework set forth in *Strickland*, 466 U.S. at 687–88; *see Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States v. Sutherland*, ___ F. 4th ___, 2024 WL 2787960 at *4; *United States v. Palacios*, 982 F.3d 920, 923 (4th Cir. 2020); *United States v. Akande*, 956 F.3d 257, 260 (4th Cir. 2020); *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Hall*, 771 F. App'x 226, 227 (4th Cir. 2019) (per curiam); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017). First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 580 U.S. at 118; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149*; United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see also United States v. Richardson*, 820 F. App'x 225, 226 (4th Cir. 2020) (per curiam); *United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013). The petitioner must prove his claim by a preponderance of the evidence. *Mayhew*, 995 F.3d at 176; *Pettiford*, 612 F.3d at 277.

The first *Strickland* prong, known as the "performance prong," relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms."

*Strickland*, 466 U.S. at 688; *see Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Sutherland*, 2024 WL 2787960, at *4; *Richardson*, 820 F. App'x at 225; *Powell*, 850 F.3d at 149; *Hall*, 771 F. App'x at 227. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has recognized that the "first prong sets a high bar." *Buck*, 580 U.S. at 118; *see also Powell*, 850 F.3d at 149. In *Padilla*, the Court stated, 559 U.S. at 371: "Surmounting *Strickland's* high bar is never an easy task." "'*Strickland* does not guarantee perfect representation, only a reasonably competent attorney.'" *Cox v. Warden*, ___ F.4th ___, 2024 WL 2337661, at *10 (4th Cir. May 23, 2024) (quoting *Harrington*, 562 U.S. at 110) (cleaned up).  Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck*, 580 U.S. at 118 (citation omitted). Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687).  Notably, "the *Strickland* standard must be applied with scrupulous care," because "the standard of judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105; *see United States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019).  Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland*, 446 U.S. at 689); *see Cullen v.*

*Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Richardson*, 820 F. App'x at 225-26; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).  There, "[j]udicial scrutiny of counsel's performance must be highly deferential."  *Strickland*, 466 U.S. at 689.

Under the second *Strickland* prong, known as "the prejudice prong,"  the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 580 U.S. at 119; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687; *see Thornell v. Jones*, 602 U.S. ___, ___, 144 S. Ct. 1302, ___, 2024 WL 2751215, at *6 (May 30, 2024) (death penalty case). However, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

In this case, defendant entered a plea of guilty, pursuant to a Plea Agreement.  Of relevance, the plea bargaining process is regarded as "an essential aspect of the administration of criminal

justice . . . ." *United States v. Lewis*, 633 F.3d 262, 269 (4th Cir. 2011).   Thus, the Sixth

Amendment right to counsel extends to the plea-bargaining process. *McMann v. Richardson*, 397

U.S. 749, 771 (1970); *United States v. Murillo*, 927 F.3d 808, 815 (4th Cir. 2019); *United States

v. Hall*, 771 App'x 226, 227 (4th Cir. 2019) (per curiam); *see also Frye*, 566 U.S. at 140-44; *Lafler*,

566 U.S. at 162.

In *Hill v. Lockhart*, *supra*, 474 U.S. 52, the Supreme Court explained that, "where . . . a

defendant is represented by counsel during the plea process and enters his plea upon the advice of

counsel, the voluntariness [and intelligence] of the plea depends on whether counsel's advice 'was

within the range of competence demanded of attorneys in criminal cases.'"   *Id.* at 56 (citation

omitted). But, in assessing whether counsel's performance was deficient, courts adopt a "strong

presumption" that counsel's actions fell within the "wide range of reasonable professional

assistance." *Strickland*, 466 U.S. at 689.

The prejudice prong of the *Strickland* test is "slightly modified" in the context of plea

bargaining. *Hooper v. Garraghty*, 845 F.2d 471, 475 (4th Cir. 1988). In *Hooper*, the Fourth Circuit

explained, *id.* (quoting *Hill*, 474 U.S. at 59):   "When a defendant challenges a conviction entered

after a guilty plea, [the] 'prejudice' prong of the [*Strickland*] test is slightly modified. Such a

defendant 'must show that there is a reasonable probability that, but for counsel's errors, he would

not have pleaded guilty and would have insisted on going to trial.'"   *Accord Burket v. Angelone*,

208 F.3d 172, 189 (4th Cir. 2000); *see also Richardson*, 820 F. App'x at 226.

*Hooper*, 845 F.2d 471, is illustrative.  There, the defendant, who had a history of mental

illness, pled guilty in a Virginia court to second-degree murder. *Id.* at 472. However, his lawyers

failed to obtain a psychiatric evaluation before the defendant's entry of the guilty plea. *Id.* Hooper

subsequently filed a habeas corpus petition, which the district court denied. *Id*. On appeal, the

Fourth Circuit noted that the "burden is on Hooper to establish a reasonable probability that if his lawyers had obtained a psychiatric report, he would have rejected the plea agreement" and gone to trial. *Id.* at 475.

The Fourth Circuit examined a psychiatric report obtained after the guilty plea against the background of the circumstances Hooper faced at the time he decided to plead guilty. The Court was not persuaded that the report provided evidence sufficient to establish a reasonable probability that Hooper would have declined the plea agreement and gone to trial, even if his counsel had obtained a psychiatric report at the time. *Id.* at 475-76. Although the Court concluded that the failure to obtain a psychiatric report fell below the objective standard of reasonableness established by *Strickland*, it was satisfied that Hooper was not prejudiced because there was no reasonable probability that the deficiency changed the outcome of the proceeding.

Notably, the defendant has the burden to establish a reasonable probability that, but for counsel's deficient performance, he would not have entered a plea of guilty. *Murillo*, 927 F.3d at 817.  As discussed below, there is no basis on which to find a reasonable probability that defendant would have rejected the Plea Agreement if his lawyer had done anything differently.

## 2.  Discussion

Defendant's assertions of ineffective assistance of counsel ring hollow.  On both prongs—performance and prejudice—he woefully fails to satisfy *Strickland* and its progeny.

The performance of defendant's counsel was impressive.  Counsel obtained a plea offer from the government that was limited to two out of eight charges.  It included a plea to Possession of a Firearm in Furtherance of a Drug Trafficking Crime (Count Eight), which carries a five year mandatory minimum consecutive sentence.  However, the defendant faced three counts of

Brandishing a Firearm During a Crime of Violence, each of which carries a mandatory minimum consecutive sentence of seven years.  *See* 18 U.S.C. § 924(c)(1)(A)(i), (ii).

At sentencing, the government observed, ECF 90-2 at 23: "And Your Honor, typically in cases like this, the Government insists upon a guilty plea to the most serious readily provable offense, i.e. Hobbs Act robbery in violation of 1951(a) and brandishing a firearm in violation of 18 U.S.C. 1924(c) which carries a seven-year mandatory consecutive sentence. The mandatory minimum at issue here is a five-year mandatory consecutive sentence. This defendant has already in this -- in the parties' plea agreement received a very significant benefit . . .".

Similarly, in its sentencing memorandum, ECF 54, the prosecutor stated, *id.* at 10, that "the 11 year sentence recommended by the Government is more than . . . three years below the guidelines range that would have applied had the Government insisted on guilty pleas to Hobbs Act Robbery and Brandishing a Firearm During a Crime of Violence".

Defense counsel also obtained a plea agreement under Fed. R. Crim, P. 11(c)(1)(C). Pursuant to the C Plea, the government agreed to a maximum sentence of 132 months' imprisonment, which was well below the bottom of the Guidelines range of 147 months to 168 months. ECF 72 at 21.  And, the defense was able to advocate for a shorter sentence.

Further, defendant's counsel presented extensive and impressive mitigation materials before and at sentencing.  *See* ECF 55; ECF 55-1 to ECF 55-6.  The laudable effort of defense counsel did not go unnoticed by the Court.  At sentencing, the Court said:  ECF 90-2 at 45:  "I just have to extol . . . the defense for an extraordinary effort and [presentencing] submission . . . ."

Moreover, as the government observes (ECF 90 at 16), Wesson never expressed confusion or concern at his Rule 11 hearing about the impact of the relevant conduct.  To the contrary, he indicated that he understood the provisions of the Plea Agreement.  ECF 90-1 at 11, 15, 16, 19.

It is also significant that defendant cannot establish error as to the calculation of his offense level based on the armed robberies to which he stipulated.  Therefore, his lawyer did not err in failing to object.

In this regard, U.S.S.G. § 1B1.2(c) is relevant.  It provides:  "A plea agreement (written or made orally on the record) containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been convicted of additional count(s) charging those offense(s)."  *See also* ECF 48 at 4 ("The Statement of Facts specifically establishes the commission of three armed robberies.")

In short, defendant cannot establish either deficient performance or prejudice.  Moreover, Wesson does not even attempt to demonstrate "that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *United States v. Fugit*, 703 F.3d 248, 259 (4th Cir. 2012).  His claim of ineffective assistance of counsel is specious.

### B.  Due Process

Ground Two asserts a related claim.  Defendant lodges a due process violation under the Fifth Amendment, predicated on the claim that the Court improperly considered his arrests for the armed robberies, and treated them as convictions, even though defendant was not convicted of those offenses.

Defendant's repackaging of his claim as a due process violation does not cloak it with merit.  Wesson has not established a due process violation based on his complaint regarding the significance of the relevant conduct.

The defendant's commission of three armed robberies was conduct to which he admitted.  And, it was properly considered in the PSR and by the Court in calculating defendant's Guidelines.  Indeed, defendant's Plea Agreement could not be clearer in this regard.

The armed robberies were recounted at length in the Plea Agreement, of which defendant had notice. ECF 48, ¶ 6(b) is titled "Relevant Conduct" and provides, in part: "The Statement of Facts specifically establishes the commission [of] three armed robberies." And, the Plea Agreement also included the anticipated Guidelines calculation based on those robberies. *Id.* ¶¶ 6(c)-6(f).

Moreover, Judge Blake reviewed the terms of the Plea Agreement and the facts with Wesson when he pled guilty. *See*, *e.g.*, ECF 90-1 at 12-14. Significantly, defendant agreed that he committed the offenses outlined in the Plea Agreement. *Id.* at 15.

Defendant was charged with three separate robberies in August of 2020, and with brandishing a firearm during all three offenses. A conviction as to those six offenses would have exposed the defendant to a significant sentence. But, the parties agreed that defendant would be allowed to plead guilty to the drug offense and use of a firearm in connection with it, subject to his admission to the commission of the three armed robberies. Defendant was well aware that he was admitting to the commission of those three armed robberies and that they would be included in calculating his Guidelines for Count Seven.

There was no due process violation on this basis.

### B.  Defendant's Juvenile Record

Defendant asserts due process claims in grounds three and four, based on the Court's consideration of his juvenile record in calculating his criminal history. The claims lack merit.

In Ground Three, defendant complains about the reference in the PSR to his juvenile record. ECF 88 at 7. He asserts that the Guidelines make "abundantly clear that juvenile arrests or convictions <u>cannott</u> [sic] be considered for purposes of sentencing and should not even appear

in the pre-sentence report." *Id.* (underline in original).  In his view, this error constitutes a due process violation.

In Ground Four, defendant again asserts a due process violation, claiming the Court erroneously "applied 5 total points due to petitioners [sic] juvenile record", even though it is "very clear that a criminal defendants [sic] juvenile record can not be used . . . ." *Id.* at 8.

For starters, the Court assigned three points for three prior offenses.  ECF 72, ¶¶ 57, 58, 59.  The defendant committed all three offenses when he was a minor — at ages 13 and 15.  Then, two more points were added because the defendant was under supervision for the offense set forth in ECF 72, ¶ 59.  *See id.* ¶ 62.  This increased defendant's score to five points.  *Id.* ¶ 63.

The claims as to defendant's criminal history are procedurally defaulted because they were not raised on direct appeal.  But, even if defendant's claims are not procedurally defaulted, they lack merit.

U.S.S.G. § 4A1.2(d) permits the consideration of certain "offenses committed prior to age eighteen."  Under U.S.S.G. § 4A1.2(d)(2)(B), one point is added for each juvenile sentence imposed within five years of the underlying offense.  The PSR accurately applied this provision.  *See* ECF 72, ¶¶ 57, 58, and 59.  And, there was no error by the Court in considering them to calculate defendant's criminal history category.

## IV.  The Writ

Defendant has filed a "Writ of Mandamus," seeking a re-sentencing pursuant to Amendment 821.  The Amendment went into effect on November 1, 2023.[4]

At the time of defendant's sentencing on November 7, 2022, defendant had three criminal history points.  *See* ECF 72, ¶¶ 57, 58, 59, 61.  And, under U.S.S.G. § 4A1.1(d), two points were

---

[4] As noted, the FPD has declined to supplement defendant's Motion on this basis.

added because defendant was "under a criminal justice sentence for CDS Possession," referenced in ¶ 59.  *See id.* ¶ 62.  Three points would result in a criminal history category of II.  But, five points yields a criminal history category of III.  *Id.* ¶ 63.  For Count Seven, the Guidelines called for a sentence of incarceration ranging from 87 to 108 months.  *Id.* ¶ 98.  The total Guidelines, inclusive of Count Eight, were 147 to 168 months of imprisonment.  *Id.* ¶ 98.

The Guidelines were amended, effective November 1, 2023.  Of pertinence here, under U.S.S.G. § 4A1.1(e), a defendant is now potentially subject to only a one-point increase if he commits an offense while under any criminal justice sentence.  And, even that one point may not be imposed unless the defendant has at least seven criminal history points.  Thus, if defendant were sentenced today, his criminal history category would be II, not III.

To be sure, a court is not barred from considering under 18 U.S.C. § 3553(a) the fact that a defendant committed an offense while on supervision.  But, that fact would not necessarily impact the defendant's criminal history category.

Here, if defendant had a criminal history of II, with an offense level of 27 for Count Seven, his Guidelines would have been 78 to 97 months, rather than 87 to 108 months.  And, including the 60-month sentence required for Count Eight, his total Guidelines range would have been 138 to 157 months, rather than 147 to 168 months.  However, consistent with the C Plea, the government sought a below-Guidelines sentence of 132 months.  And, the Court imposed a total sentence of 125 months.  In other words, the sentence is below the current Guidelines.

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see Freeman v. United States*, 564 U.S. 522, 526 (2011); *United States v. Davis*, 99 F.4th 647, 653 (4th Cir. 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381,

383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman*, 564 U.S. at 526.  One such exception is when the modification is "expressly permitted by statute."  *See*  18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

Section 3582(c)(2) of 18 U.S.C. § 3582(c)(2) is relevant. It permits a court to reduce the sentence of a defendant who was "sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission," if the reduction is consistent, *inter alia*, with the sentencing factors in 18 U.S.C. § 3553(a).

As stated, under § 3582(c)(2), a defendant may be eligible for relief if an amendment to the Sentencing Guidelines has been made retroactively applicable. *United States v. Riley,* ELH-13-0608, 2022 WL 9361679, at *5 (D. Md. Oct. 14, 2022) (citing *Dillon v. United States,* 560 U.S. 817, 826 (2010)).  One such retroactive amendment is Amendment 821 to the Sentencing Guidelines, which went into effect in November 2023.

Amendment 821 "is a multi-part amendment."  *United States v. Gary*, JKB-08-086, 2024 WL 1641007, at *1 (D. Md. Apr. 16, 2024).  O f  r e l e v a n c e ,  Part A pertains to criminal history and "status points."  *Id.*  As noted, Amendment 821 permits only one status point if a defendant has seven or more criminal history points.  But, it eliminates any status point for a defendant who "has six or fewer criminal history points."  *Id.*

Therefore, under Amendment 821, defendant would not receive any status points for being

on supervision when the offenses occurred. Because he only had three criminal history points, he is not even eligible for one status point. As a result, this would reduce defendant's criminal history category from III to II.

But, as reviewed above, the amendment alone does not compel a reduction in sentence. The Court must still consider the factors under 18 U.S.C. § 3553(a).

This was not a case where the sentence was based on the Guidelines. The top end of the C Plea range was below the bottom of the then-existing Guidelines. And, defendant's sentence of 125 months is below the current Guidelines range, even after taking Amendment 821 into account. *See United States v. Mitchell*, 5:19-00053, 2024 WL 185360, at *1 (S.D. W. Va. Jan. 17, 2024) (denying a § 3582(c)(2) motion because the defendant's sentence was below the guidelines range even after giving effect to Amendment 821).

Moreover, the factors under 18 U.S.C. § 3553(a) do not warrant a sentence reduction under § 3582(c)(2). Defendant's conduct in committing three armed robberies, and where he pointed a gun at the head of an employee at the store, was serious by any measure. The sentence was reasonable, and a further reduction would not promote respect for the law.

Put another way, the criminal history category is of no consequence in the context of this case. Therefore, I shall deny the Writ.

## VII.  Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant as to a post conviction claim.

A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). In other words, unless a COA is issued, a

petitioner may not appeal the court's decision in a § 2255 proceeding. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, 580 U.S. 100, 115 (2017). Where the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

As indicated, a COA may issue only if the defendant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Defendant has not made a substantial showing of the denial of his constitutional rights.  Therefore, I decline to issue a COA.[5]

An Order follows, consistent with this Memorandum Opinion.

Date:   June 12, 2024                                                    /s/
                                                        Ellen L. Hollander
                                                        United States District Judge

---

[5] The denial of a COA by the district court does not preclude defendant from seeking a COA from the appellate court, *i.e.*, the United States Court of Appeals for the Fourth Circuit.